UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| BOCA PARK MARKETPLACE SYNDICATIONS GROUP, LLC, | Case No. 2:16-cv-01197-RFB-PAL |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| ROSS DRESS FOR LESS, INC., | |
| Defendants. | |

## I. INTRODUCTION

Before this Court comes Plaintiff Boca Park Marketplace Syndications Group, LLC ("Boca Park")'s Motion for Summary Judgment (ECF Nos. 69, 84) and Defendant Ross Dress for Less, Inc. ("Ross")'s Motion for Summary Judgment (ECF No. 72). For the reasons stated below, the Court denies these motions. Boca Park additionally filed a Motion to Strike [73] Appendix (ECF No. 86), and a Motion to Strike [73] Declaration, (ECF No. 87), and both Plaintiff and Defendant filed motions to seal (ECF Nos. 71, 75, 83), which the Court grants as discussed below.

## II. PROCEDURAL HISTORY

On April 18, 2016, Boca Park filed a Complaint against Ross in the Eighth Judicial District Court in Clark County, Nevada. (ECF No. 1-2). Boca Park asserts the following causes of action: (1) declaratory judgment, declaring that the co-tenancy provisions in the commercial lease at issue constitute the imposition of a penalty and are unenforceable, and (2) breach of contract. Ross filed a Notice of Removal on the grounds of diversity jurisdiction on May 27, 2016. (ECF No. 1).

On June 13, 2016, Ross filed an Answer and Counterclaim to the Complaint. (ECF No. 6). Ross brings its counterclaim seeking a declaratory judgment, declaring that the co-tenancy

provisions in the lease and lease amendment, together with the Substitute Rent provision contained therein, were negotiated at arm's length between the parties of equal standing and are enforceable. Boca Park filed an Answer to the Counterclaim on June 20, 2016. (ECF No. 9).

On May 11, 2017, Boca Park filed a redacted version of its Motion for Summary Judgment. (ECF No. 69).[1] The same day, Boca Park filed a Motion to Seal the Motion for Summary Judgment and certain attached exhibits. (ECF No. 71). Ross filed its Motion for Summary Judgment on May 12, 2017. (ECF No. 72). Ross additionally filed a Motion to Seal an attachment to its Motion for Summary Judgment the same day. (ECF No. 75). On June 1, 2017, Ross filed a Response to Boca Park's Motion (ECF No. 80) and an additional Motion to Seal (ECF No. 83). Boca Park filed its Response to Ross' dispositive motion on June 2, 2017. (ECF No. 85). Also on June 2, 2017, Boca Park filed two Motions to Strike attachments to Ross' Motion for Summary Judgment. (ECF Nos. 86, 87). On June 15, 2017, Boca Park filed a Reply to its dispositive Motion. (ECF No. 89). The following day, Ross filed its Reply. (ECF No. 90). Ross filed Responses to the Motions to Strike on June 16, 2017. (ECF Nos. 91, 92). Boca Park filed its Replies on June 23, 2017. (ECF Nos. 94, 95).

### III. UNDISPUTED FACTS

The Court finds that the following facts are undisputed. Plaintiff Boca Park owns and operates the Boca Park Marketplace Shopping Center ("the Shopping Center") constructed between 2000 and 2003 and located at the intersection of West Charleston and South Rampart Boulevards. Boca Park is owned by an entity called Triple Five Group ("Triple Five"). The major tenants in the Shopping Center include Target, Office Max and Ross. Defendant Ross is the nation's largest retailer of "off-price" apparel and home fashion. Ross Store #522 (Store 522) is a 30,000-sq. ft. store which opened in the Shopping Center in 2001.

The parties entered a 71+ page lease for Store 522 on November 1, 2000 ("the Lease"). The Lease provides Ross a 10-year initial term with four additional five-year options, for a potential 30-year total term. Ross's relevant monetary obligation to Boca Park is comprised of two

---

[1] The unredacted motion is filed under seal at ECF No. 84.

components, what the Lease refers to as "Minimum Rent" and "Reimbursements." At the commencement of the Lease, Ross's "Minimum Rent" obligation started at $37,733.75 monthly, or $452,805.00 annually, and then increased at five-year intervals. Between Year 11 and Year 15 of the Lease (February 2012 to January 2017), Minimum Rent was $42,764 monthly, not including common area maintenance ("CAM") charges, insurance, or taxes. In February 2017, Minimum Rent rose to $42,280.50 monthly, not including CAM charges, insurance, and taxes.

As part of the Lease, Ross also agreed to pay Boca Park three categories of "Reimbursements" defined at § 2 of the Lease and further as:

    i.    § 7.4.1, Ross's "Pro Rata Share of the Common Area Charges," or 10% (§ 1.8), payable annually;
    ii.    § 8.2.1, Ross's "Pro Rata Share of the Tax Bill," payable annually, and
    iii.    § 9.1.3, Ross's "pro rata share of the premium for the casualty insurance described in Section 9.1.1" of the Lease, also payable annually.

Pursuant to a provision of the lease with the heading "Guaranteed Co-Tenancy," Ross's obligation to Boca Park to pay Minimum Rent and Reimbursements was conditioned on the existence of designated "co-tenants" which were to occupy specific store locations of required sizes in the shopping center – Target, Vons, and Office Max. Also pursuant to the Lease, if any of the aforementioned three co-tenants quit their respective premises in the Shopping Center, then "Substitute Rent" applied, which was defined in the Lease as "the lesser of (a) Minimum Rent, or (b) two percent (2%) of Tenant's Gross Sales during the preceding month. Substitute rent, where applicable in this Lease, shall be paid in lieu of Minimum Rent, Percentage Rent, and Reimbursements."

The Lease obligated Ross to pay monthly Minimum Rent, not subject to a right of off-set or deduction, unless a "Reduced Occupancy Period" or other contracted circumstance occurred. In a section of the Lease titled "Co-Tenancy Requirements," the Lease provided that a Reduced Occupancy Period would occur unless all of the following requirements were met:

(i) all the co-tenants specified in Section 1.7.1 [Target, Vons, and Office Max] (the "Co-Tenants") shall be open in the Shopping Center every day (except for nationally recognized holidays) for business to the public, during such Co-Tenant's designated hours; (ii) all the Co-Tenants are operating in at least the Leasable Floor Area specified in Section 1.7.1; and (iii) retail occupants of the Inline Buildings are open and operating under bona fide leases of a minimum of two (2) years' duration or occupancy agreements (except for the Co-

Tenants, in which case the existence of a lease or occupancy agreement is not required) in at least the percentage of the Leasable Floor Area of the Inline Buildings indicated in Section 1.7.1 (the Store shall be excluded from the numerator and denominator of the fraction used to calculate such percentage). Landlord shall promptly notify Tenant of any Reduced Occupancy Period.

The Lease further included a section for "Co-Tenancy Remedies," which provided in relevant part:

> If a Reduced Occupancy Period exists on the Commencement Date or at any time after the Commencement Date . . . , Tenant's total obligation for Rent shall be replaced by Substitute Rent which shall be payable within fifteen (15) days after the close of each calendar month during the Reduced Occupancy Period. If the Reduced Occupancy Period continues for a period of one hundred eighty (180) consecutive calendar days, Tenant may, at its option, either (i) terminate this Lease upon thirty (30) days' notice to Landlord (the 'Termination Notice'), or (ii) continue to pay Substitute Rent with the ongoing option to terminate this Lease until such time as the Reduced Occupancy Period ceases to exist. . . . The provisions of this Section 6.1.3(b) shall apply to any subsequent Reduced Occupancy Period.[2]

Thus, in the event of a Reduced Occupancy Period, under the terms of the Lease Ross had an option to pay Minimum Rent or pay Substitute Rent amounting 2% of its monthly gross sales, which is approximately 75%, or $35,000 per month, less than Minimum Rent.

On August 31, 2015, one of the three initial guaranteed co-tenants, Vons, a supermarket, ceased doing business in Boca Park. Effective August 31, 2015, Ross and Boca Park executed a First Amendment to Lease. Pursuant to the First Amendment, Ross agreed to replace Vons with Spirit Realty Capital d/b/a Haggen ("Haggen"), another supermarket, as a guaranteed co-tenant.

On or about December 6, 2015, Haggen ceased doing business at Boca Park. A Reduced Occupancy Period therefore resulted. On March 18, 2016, Ross notified Boca Park that it was invoking the co-tenancy provision in the Lease and declared that a "Reduced Rent Period" was in effect as of November 17, 2015. Ross also demanded that Boca Park refund $158,047.48 in rent which Ross claimed to have overpaid. Boca Park sent a letter to Ross on March 25, 2016 rejecting the enforcement of the co-tenancy provision as what Boca Park considered to be an unenforceable penalty.

During the litigation, Ross notified Boca Park that it would pay the Minimum Rent "under

---

[2] The "Co-Tenancy Requirements" and "Co-Tenancy Remedies" are hereinafter referred to as "the co-tenancy provisions."

protest." In accordance with that notice, Ross paid Boca Park $593,955.35 representing the difference between the Minimum Rent owed under the Lease and the Substitute Rent paid by Ross through January 2017. As of the time motions for summary judgment were filed, Ross is continuing to pay Minimum Rent "under protest."

## IV. LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

### B. Motion to Strike

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Further, district courts have inherent power to control their own dockets, including the power "to determine what appears in the court's records" and to strike items from the docket to address conduct that is improper but does not warrant dismissal. Ready Transp., Inc. v. AAR Mfg., Inc., 627 F.3d 402, 404-05 (9th Cir. 2010).

### C. Motion to Seal

Courts have long recognized "a general right to inspect and copy public records and documents, including judicial records and documents." Kamakana v. City & Cty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 &

n.7 (1978) (quotation marks omitted). However, this right is not absolute. Id. There is a "strong presumption in favor of access" to dispositive motions or their attachments, and a party seeking to seal such document bears the burden of overcoming this presumption by providing a compelling and fact-based reason for the document to be sealed. Id. (citations and quotation marks omitted). "[I]f the court decides to seal certain judicial records [attached to dispositive motions], it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." Id. at 1179 (citation and quotation marks omitted). Compelling reasons for sealing judicial records include protection against the release of trade secrets. Id. (citation omitted).

## V.  DISCUSSION

### A.  Motions for Summary Judgment

#### *1.  Legal Standard*

The Court evaluates the Lease provisions under Nevada law. The subject of the Lease is Ross Store 522, located in the Shopping Center in Las Vegas, Nevada, and the Lease provides for construction in accordance with the laws of the state in which the store is located.

Under Nevada law, to show a breach of contract a plaintiff must establish: "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013). "Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." May v. Anderson, 119 P.3d 1254, 1257 (Nev. 2005).

The Court also applies Nevada law in its determinations of whether the co-tenancy provisions operate as liquidated damages and whether those provisions are nonetheless enforceable. "[L]iquidated damage provisions are prima facie valid . . . and serve as a good-faith effort to fix the amount of damages when contractual damages are uncertain or immeasurable." Khan v. Bakhsh, 306 P.3d 411, 414 (Nev. 2013) (alteration in original) (citations and quotation marks omitted); see also Mason v. Fakhimi, 865 P.2d 333, 335 (Nev. 1993) (defining liquidated damages as "the sum which a party to a contract agrees to pay if he fails to perform, and which,

having been arrived at by a good faith effort to estimate the actual damages that will probably ensue from a breach, is recoverable as agreed-upon damages should a breach occur.") (citation omitted).

The party challenging a liquidated damages provision bears the burden of establishing that the provision is a penalty. Mason, 865 P.2d at 335 (citation omitted). A liquidated damages provision may be held unenforceable if the liquidated damages contracted to are disproportionate to the actual damages the injured party sustained. Id. (citation omitted). Further, where a liquidated damages provision "requires ascertaining actual damages and imposes additional damages as a penalty for breach," such provision is unenforceable. Khan, 306 P.3d at 414 (citations omitted).

"'As distinguished from liquidated damages, the term 'penalty,' as used in contract law, is a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages which may be sustained by reason of non-performance, and it involves the idea of punishment. . . . [The] distinction between a penalty and liquidated damages is that a penalty is for the purpose of securing performance, while liquidated damages is the sum to be paid in the event of non-performance." Mason, 865 P.2d at 335 (quoting 22 AM.JUR.2d Damages § 684 (1980)).

"[T]he determination of whether a liquidated damages clause is enforceable is equitable in nature and is to be decided as a matter of law by the court and not the jury." Loomis v. Lange Fin. Corp., 865 P.2d 1161, 1163 (Nev. 1993) (alteration in original).

### *2. The Parties' Arguments*

In its Motion for Summary Judgment, Boca Park argues that the Court should construe the co-tenancy provisions in the Lease as a liquidated damages clause that amounts to an unenforceable penalty. Boca Park contends that the closure of Haggen caused no significant loss to Ross, or at minimum, no loss proportional to the reduction in rent Boca Park suffers if Ross is permitted to pay Substitute Rent rather than Minimum Rent. In support of its position, Boca Park relies upon multi-year financial information purportedly depicting an annual decrease in Store 522's gross sales even before Haggen closed. Boca Park also relies on the deposition testimony of John Massing ("Massing"), Senior Vice President of Leasing for Triple Five. Massing testified

that he did not believe that Haggen's closure had a significant impact upon Ross' sales because Target, another retailer in the Shopping Center, maintained a strong sales performance before and after Haggen closed, and additionally because no other tenant complained that Haggen's closure affected sales. Boca Park essentially argues that, in light of these facts, the co-tenancy provisions allowing Ross to pay Substitute Rent during a Reduced Occupancy Period is grossly disproportionate to any actual damages suffered by Ross.

Ross argues in its Response and in its own Motion for Summary Judgment that the co-tenancy provisions do not operate as liquidated damages, but rather function as a negotiated dual-rent structure: if all of the "Co-Tenancy Requirements" are met, then Ross pays Minimum Rent as provided by the Lease; otherwise, Ross has the option to pay Substitute Rent. Ross contends that the undisputed evidence shows that the leased premises are much less attractive, and worth considerably less, when the Shopping Center is missing an anchor tenant. Ross relies on the Declaration of Gregg McGillis ("McGillis"), Group Senior Vice President of Property Development for Ross Stores, Inc., in support of its argument. Ross additionally argues that even if the Court construes the co-tenancy provisions as liquidated damages, there is a disputed material fact as to the reasonableness of the difference between Substitute Rent and Minimum Rent. Ross cites to an exhibit attached to the McGillis Declaration which purports to demonstrate the losses in sales at Store 522 following the closure of Haggen, in comparison to other local stores, all Ross retail stores, and company projections. Further, Ross argues that Boca Park is equitably estopped from challenging the enforceability of the co-tenancy provisions because Boca Park affirmed these provisions when it agreed to the First Amendment to the Lease.

### 3. *The Court's Findings*

The Court denies both Motions for Summary Judgment, as it can neither find that the co-tenancy provisions operate as liquidated damages, nor that the co-tenancy provisions are otherwise an unenforceable penalty. At the hearing on the matter, both parties cited to their proffered evidence in support of their arguments – arguments that constitute competing interpretations of the relationship between Ross' payment of Substitute Rent and its actual losses following the closure of Haggen. The Court finds that, even if it concludes that the co-tenancy provisions function as a

liquidated damages, the determination of whether a liquidated damages provision is enforceable is an equitable one that cannot be decided as a matter of law on summary judgment. The case will proceed to trial so that the Court, in its role as factfinder and sitting in equity, can review the facts in the context of how the co-tenancy provisions function as well as their impact upon the parties – to Ross' sales and to Boca Park's rent based upon those sales – once an anchor tenant ceases to operate a store in the Shopping Center. The Court finds that, before it can decide as a matter of law whether the co-tenancy provision is reasonable and enforceable, it must engage in factfinding which is not permitted at this stage. That factfinding may relate to and encompass the evidence already submitted by the parties, but the Court cannot grant summary judgment without further inquiry into the underlying facts.

The Court does find as a matter of law that Boca Park is not estopped from challenging the enforceability of the co-tenancy provisions based upon its signing the First Amendment to Lease. The Court finds that equitable estoppel is not warranted where a party contends that a contractual provision is unenforceable because it leads to the imposition of grossly disproportionate damages, not forecasted at the time the contract was negotiated, as Boca Park argues in this case.

### B. Motions to Strike and Motions to Seal

The Court grants Plaintiff's Motions to Strike. (ECF Nos. 86, 87). With regard to Plaintiff's Motion to Strike Defendant's expert Declaration and Report (ECF No. 86), the Court finds no basis to revisit its denial of Defendant's Motion to Reconsider (Order, ECF No. 97), and therefore does not find the disclosure of experts appropriate at this stage in the litigation. As to Plaintiff's Motion to Strike the Declaration of Gregg McGillis and the Sales Impact Analysis attached to the Declaration (ECF No. 87), the Court finds that these documents must be stricken, as McGillis does not properly set forth the methodology for the proffered financial calculations, and further, the Declaration and Exhibit are an attempt to circumvent expert disclosure which is no longer available. However, the Court denies without prejudice Plaintiff's request for fees at this time; Plaintiff may raise this request at the pretrial conference.

Boca Park filed a Motion to Seal its unredacted Motion for Summary Judgment, an unredacted version of a Declaration in support of the Motion, and related exhibits. (ECF No. 71).

Ross also filed two Motions to Seal, requesting that the Court seal the McGillis Declaration and the Sales Impact Analysis, both exhibits to Ross' Motion for Summary Judgment. (ECF Nos. 75, 83). The Court finds a compelling reason to seal these documents: to maintain confidentiality of Ross' financial projections and other non-public information that includes trade secrets. The Court therefore grants the Motions to Seal.

**VI. CONCLUSION**

For the reasons stated above,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (ECF Nos. 69, 84) is DENIED. **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 72) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff's Motions to Strike (ECF Nos. 86, 87) are GRANTED.

**IT IS FURTHER ORDERED** that the Motions to Seal (ECF Nos. 71, 75, 83) are GRANTED.

**IT IS FURTHER ORDERED** that the parties are further instructed to file a Joint Pretrial Order by **April 18, 2018**. A pretrial conference is set for **May 4, 2018 at 3:30 p.m.** to discuss the parameters of evidence to be presented at trial.

DATED: March 28, 2018.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**