UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BOCA PARK MARKETPLACE SYNDICATIONS GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ROSS DRESS FOR LESS, INC.,<br><br>Defendant. | Case No. 2:16-cv-01197-RFB-PAL<br><br>**ORDER**<br><br>**Findings of Fact and Conclusions of Law After Court Trial** |

## I.   INTRODUCTION

This case is a contract action in which Plaintiff Boca Park Marketplace Syndications Group, LLC ("Boca Park") alleges that a co-tenancy clause in its lease agreement with Defendant Ross Dress for Less, Inc. ("Ross") constitutes an unenforceable liquidated damage. The Court held an eight-day bench trial in this case from April 30, 2018 through May 10, 2018. The Court rules in favor of Ross and against Boca Park based on the following findings of fact and conclusions of law.


## II.   PROCEDURAL HISTORY

On April 18, 2016, Boca Park filed a Complaint against Ross in the Eighth Judicial District Court in Clark County, Nevada. ECF No. 1-2. Boca Park asserts the following causes of action: (1) declaratory judgment, declaring that the co-tenancy provisions in the commercial lease at issue constitute the imposition of a penalty and are unenforceable, and (2) breach of contract. Ross filed a Notice of Removal on the grounds of diversity jurisdiction on May 27, 2016. ECF No. 1.

On June 13, 2016, Ross filed an Answer and Counterclaim to the Complaint. ECF No. 6. Ross brings its counterclaim seeking a declaratory judgment, declaring that the co-tenancy

provisions in the lease and lease amendment, together with the Substitute Rent provision contained therein, were negotiated at arm's length between the parties of equal standing and are enforceable. Boca Park filed an Answer to the Counterclaim on June 20, 2016. ECF No. 9.

In May 2017, Boca Park and Ross each filed Motions for Summary Judgment. ECF Nos. 69, 72, 84. The Court heard oral argument on the motions on March 20, 2018. ECF No. 101. In an order issued March 28, 2018, the Court denied each Motion for Summary Judgment. ECF No. 103. The Court determined that factfinding was required for the Court to evaluate whether the co-tenancy provision was a liquidated damages provision and whether it was enforceable. The Court therefore ordered that the case proceed to trial.

The Court held a pretrial conference on June 7, 2018 and a calendar call on August 28, 2018. ECF Nos. 108, 134. The Court conducted a bench trial on September 4, 2018 and heard closing arguments on October 18, 2018. ECF Nos. 139, 150.

### III.    JURISDICTION AND VENUE

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. Venue is proper because the commercial lease agreement at issue relates to property within Clark County, Nevada.

### IV.    FINDINGS OF FACT

Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The court must make findings sufficient to indicate the factual basis for its ultimate conclusion. Kelley v. Everglades Drainage District, 319 U.S. 415, 422 (1943). The findings must be "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 856 (9th Cir.), cert. denied, 464 U.S. 863 (1983) (citations omitted).

Accordingly, following the bench trial and having reviewed all of the evidence and observed all of the witnesses, the Court makes the following findings of fact in this case.

**A. Parties / Background**

1. Boca Park Shopping Center ("the Shopping Center") is owned by an entity called Triple Five Group ("Triple Five"). Triple Five has controlled the Shopping Center through its affiliates, including Plaintiff Boca Park, from the time of its development to the present.

2. Triple Five is a sophisticated, multi-national real estate company with extensive experience in shopping center development and leasing.

3. Ross is likewise sophisticated in real estate leasing, with over 1,500 retail stores nationally. Ross locates most of its stores in shopping centers. The value of a shopping center to Ross depends in part upon the other tenants and the retail environment of the shopping center.

**B. Lease Negotiations**

4. In 1999, Boca Park and Ross began negotiating a lease for a Ross store in the Shopping Center. Both parties were represented by counsel.

5. By letter dated May 11, 1999, Ross provided to Boca Park its original proposal to lease a premises in the Shopping Center.

6. The original proposal provided for a base term of ten years with an annual base rent of $12.00 per square foot for the first five years and $12.50 per square foot for the sixth through tenth year. The proposal provided four renewal options of five years each, with base rent increasing by $0.50 per square foot every five years. The proposal also made Ross financially responsible for reimbursements, which include maintenance, insurance, and taxes.

7. The original proposal also included a co-tenancy clause, which stated as follows:

> As an inducement to Tenant to enter into the lease, Landlord covenants that on the commencement date and continuing throughout the full term of the lease, 70% of the Leasable Floor Area (LFA) in the shopping center (excluding Tenant) shall be occupied and shall include Target (136,00 [*sic*] sq. ft.), Vons (62,977 sq. ft.[]) and two (2) nationally or regionally recognized, operating retail tenants each occupying no less than 25,000 square feet. If at any time that minimum co-tenancy is not met, Tenant's remedy shall be to pay the lesser of Minimum Rent or 2% of gross sales ("Substitute Rent"), in lieu of Minimum Rent, Percentage Rent (as defined in Section 7 above) and reimbursements, until the minimum co-tenancy is restored.

If, after six (6) months, minimum co-tenancy is still not restored, Tenant shall have the option of terminating the lease or continuing to pay Substitute Rent only with the ongoing option to terminate until such time as the minimum co-tenancy is reached. In the event Tenant terminates, Landlord shall reimburse Tenant for Tenant's unamortized leasehold improvements.

8. By letter dated June 17, 1999, Boca Park sent a response proposal which proposed adjustments to certain terms of the original proposal. Boca Park proposed either (a) an annual base rent in years one through five of $13.50 per square foot, with base rent increasing by $1.00 per square foot every five years thereafter, for 125 feet of frontage or (b) an annual base rent in years one through five of $15.00 per square foot, with base rent increasing by $1.00 per square foot every five years thereafter, for 150 feet of frontage. Regarding the co-tenancy provision, Boca Park suggested that the co-tenancy criteria require (a) only the presence and operation of Target, not also Vons and two other major retail tenants and (b) that only 60% of the Leasable Floor Area need be occupied. Boca Park also proposed that during any time that the co-tenancy criteria was not achieved, Ross would pay 3% of gross sales, rather than 2%, in lieu of minimum base rent.

9. By letter dated August 3, 1999, Ross sent a revised proposal. Ross adopted a compromised increase of annual base rent as follows:

| | |
|---|---|
| Years 1–5: | $13.00 per square foot |
| Years 6–10: | $14.56 per square foot |
| Option 1: | $15.72 per square foot |
| Option 2: | $16.98 per square foot |
| Option 3: | $18.34 per square foot |
| Option 4: | $19.81 per square foot |

Ross also adjusted its co-tenancy provision to require that 60% of the Leasable Floor Area be occupied. Ross specified the inclusion of Target, Vons, and Office Max as minimum co-tenants and maintained the 2% gross sales rate for substitute rent.

10. By letter dated February 14, 2000, Ross sent a second revised proposal. Ross again adopted an increase of annual base rent, consistent with Boca Park's request on June 17, 1999, as follows:

| | |
|---|---|
| Years 1–5: | $15.00 per square foot |
| Years 6–10: | $16.00 per square foot |
| Option 1: | $17.00 per square foot |
| Option 2: | $18.00 per square foot |
| Option 3: | $19.00 per square foot |
| Option 4: | $20.00 per square foot |

The co-tenancy provision remained unchanged from the August 3, 1999 revised proposal.

**C. Final Lease Terms**

11. The ultimately adopted lease, effective November 1, 2000, incorporated the annual base rent scheme of the second revised proposal from February 14, 2000.

12. The lease provided that a Reduced Occupancy Period would occur if, in relevant part, any of co-tenants Target, Vons, and Office Max ceased to be open to business to the public or if 60% of leasable floor area ceased to be occupied by operating retailers. The lease provided that, in the event of a Reduced Occupancy Period, Ross's rent obligation of minimum rent, percentage rent, and reimbursements would be replaced by substitute rent of 2% of Ross's gross sales (unless minimum rent was lesser), with the ongoing option to terminate the lease until the Reduced Occupancy Period ended.

13. The terms of the lease, including the co-tenancy clause, were not unusual and were consistent with market practice.

14. Prior to the execution of the Lease, the parties did not conduct any study or analysis to determine the impact of any co-tenant's customer traffic or potential closure on Ross's potential sales.

15. Ross Store #522 opened in the Shopping Center in 2001. At this time, Target, Office Max, and Vons were located in the Shopping Center and all other provisions were satisfied such that no Reduced Occupancy Period was in effect.

**D. Replacement of Vons with Haggen**

16. Vons closed in mid-2015. It was promptly replaced with Haggen, a grocery store of the same size. The store space did not close during the transition.

17. On August 31, 2015, Ross and Boca Park executed an amendment to the lease. The lease amendment constituted an agreement that Haggen was an adequate replacement for Vons

and prevented the triggering of the co-tenancy clause. Therefore, no Reduced Occupancy Period went into effect as a result of Vons's closure.

**E. Closure of Haggen**

18. On or about December 6, 2015, Haggen went into bankruptcy and closed. Pursuant to the terms of the lease, Haggen's closure triggered the co-tenancy clause.

19. By letter dated March 18, 2016, Ross gave notice that a Reduced Occupancy Period was in effect and that it would begin paying substitute rent (2% of gross sales) in lieu of annual base rent and reimbursements. Ross also requested a refund of $158,047.48 in alleged overpaid rent.

20. By letter dated March 25, 2016, Boca Park rejected Ross's enforcement of the co-tenancy clause as an unenforceable penalty.

21. Upon the triggering of the co-tenancy clause, Ross's rent obligation was 2% of Ross's monthly gross sales. This amount is approximately $12,000 per month, though it varies month to month. The payment of 2% monthly gross sales results in a significantly reduced rent payment from what Ross would otherwise pay for rent.

22. Ross paid Boca Park substitute rent until March 22, 2017. On March 22, 2017, Ross paid Boca Park $593,955.35 "under protest." This amount represents the difference between substitute rent and minimum rent plus reimbursements that had accrued.

23. Ross continues to pay, under protest, minimum rent to Boca Park.


## V.    CONCLUSIONS OF LAW

Boca Park argues it is entitled to declaratory judgment that the co-tenancy clause constitutes an unenforceable liquidated damage because it is a penalty. Ross argues that the clause is not a liquidated damage and argues that, even if it is, the clause is enforceable. The Nevada Supreme Court defines liquidated damages as "the sum which a party to a contract agrees to pay if he fails to perform, and which, having been arrived at by a good faith effort to estimate the actual damages that will probably ensue from a breach, is recoverable as agreed-upon damages should a breach occur." Mason v. Fakhimi, 865 P.2d 333, 335 (Nev. 1993) (citation omitted).

1    The Court finds that the co-tenancy clause is not a liquidated damages clause because,

2    based upon the parties' intent and agreement, the clause is not contemplative of a breach, is not an

3    attempt to estimate damages, and does not reflect an intent of the parties to impose a liquidated

4    damages clause.  "Contract interpretation strives to discern and give effect to the parties' intended

5    meaning." Galardi v. Naples Polaris, Ltd. Liab. Co., 301 P.3d 364, 367 (Nev. 2013).

6           First, the Court finds that the parties did not intend for the co-tenancy clause to be triggered

7    or based upon a breach of contract.  The contract does not require Target, Vons, and Office Max

8    be present and operating as co-tenants such that the closure of any of these tenants would constitute

9    a breach.  Rather, the contract describes that "[a] 'Reduced Occupancy Period' shall occur unless"

10   the co-tenants remain open for business to the public.  If at any time a Reduced Occupancy Period

11   occurs, Ross's rent obligation is "replaced by Substitute Rent."  The Court finds that the parties

12   intended for the co-tenancy clause to establish two alternate rent schemes.  The Court finds that

13   the parties did not intend for the co-tenancy clause to be a liquidated damages clause that would

14   be triggered by a breach of the contract.

15          Second, the Court finds that the parties did not intend for the co-tenancy clause to be an

16   estimate of actual damages.  The parties conducted no study or analysis in any attempt to quantify

17   the impact of a co-tenant's closure on Ross's sales.  Rather, the Court finds that the parties

18   knowingly adopted a substitute rent amount understanding that it would be lower than the rent

19   amount that Ross would pay if the clause was not triggered. The parties reached such an agreement

20   because it was mutually believed and understood that the value of the lease space to Ross would

21   be less if the other specified tenants were not co-tenants with Ross in the shopping center.

22          Third, the Court finds that the parties did not intend the co-tenancy clause to operate as a

23   liquidated damages clause.  Having received all of the evidence in this case, the Court finds the

24   parties negotiated and agreed to a dual rent provision and not a liquidated damages provision.  In

25   the negotiations, Boca Park sought to increase the base rents, to increase the substitute rent, to

26   identify only one co-tenant that could trigger a Reduced Occupancy Period, and to decrease the

27   percentage of the Leasable Floor Area needed to be occupied to prevent a Reduced Occupancy

28   Period.  Negotiations resulted in Boca Park prevailing on a base rent scheme starting at $15.00 per

1   square foot for the first five years and increasing by $1.00 per square foot every five years, as well

2   as decreasing the Leasable Floor Area requirement from 70% to 60%, while Ross prevailed on the

3   substitute rent rate and the plurality of co-tenants.  The parties negotiated and agreed to the relative

4   value of the property to Ross dependent on various states of tenancy and occupancy in the

5   Shopping Center.  Both parties are sophisticated corporations and both parties were represented

6   by counsel in the negotiation and execution of the lease.  They understood that they were

7   negotiating and agreed to a contract with different benefits and risks for each party.  The parties

8   could have opted to negotiate a liquidated damages term in lieu of a dual rent provision, but they

9   did not do so.

10      Because the Court finds that the co-tenancy clause is not a liquidated damages clause and

11  is therefore valid and enforceable, it follows that Boca Park does not prevail on its breach of

12  contract claim against Ross.  To show a breach of contract, a plaintiff must establish: "(1) the

13  existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the

14  breach."  Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013).  Ross has been

15  contractually obligated to pay only substitute rent from the date that Haggen closed, on or about

16  December 6, 2015.  Ross has at all times paid at least substitute rent and has for some time paid

17  more than required during a Reduced Occupancy Period.  Ross has therefore not engaged in breach

18  of the lease.

19

20  **VI.    CONCLUSION**

21      The Court finds in favor of Defendant Ross on all claims.  The Court issues declaratory

22  judgment that the co-tenancy provision of the lease agreement between Plaintiff Boca Park and

23  Defendant Ross does not constitute a liquidated damages provision and is enforceable.

24      **IT IS ORDERED** that judgment is entered in favor of Defendant Ross and against Plaintiff

25  Boca Park on Boca Park's claims for breach of contract and seeking declaratory judgment, ECF

26  No. 1, and on Ross's counter-claim seeking declaratory judgment.  ECF No. 6.

27  ///

28  ///

1       **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment for Defendant.

2 The Clerk of Court is instructed to close this case.

3       DATED: June 20, 2019.

4

5                          **RICHARD F. BOULWARE, II**
                             **UNITED STATES DISTRICT JUDGE**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28